IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 23, 2020

**STATE OF TENNESSEE v. CURTIS LANE**

**Appeal from the Criminal Court for Knox County**
**No. 112569     Scott Green, Judge**

**No. E2019-01401-CCA-R3-CD**

The defendant, Curtis Lane, appeals his 2019 Knox County Criminal Court guilty-pleaded conviction of second degree murder, arguing that the 22-year sentence is excessive. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jonathan Harwell (on appeal); Julie Gautreau and Jessica Greene (at trial), Assistant District Public Defenders, for the appellant, Curtis Lane.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Charme P. Allen, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Originally charged with one count of first degree premeditated murder and one count of possession of a firearm by a convicted felon, the defendant pleaded guilty to one count of second degree murder in exchange for dismissal of the firearm charge and a sentence to be determined by the trial court following a sentencing hearing.

At the guilty plea submission hearing, the State provided the following stipulation of facts:

> [W]itnesses essentially would say there was an altercation
> between the defendant and Mr. Dale that may have led to blows
> between Mr. Dale and the defendant.  That the defendant at

some point – that they had gone their separate ways and that the defendant returned with a weapon, with a firearm and, again, engaged Mr. Dale. That they disappeared behind a building and shots were fired.

The victim suffered a single gunshot wound that led to his death.

At the sentencing hearing, the parties stipulated that, if called to testify, Dr. Malcolm Spica would testify that the defendant's "general level of intellectual functioning . . . ranked in the impaired range" and that "his current intellectual ability is commensurate with that of a nine-year-old child."

The defendant's fiancée, Kiara Anderson, testified that she and the defendant had been together since 2011 and that they shared two children. Ms. Anderson recalled that on the day of the offense, the victim "came up and asked me where Curtis was" and that "they ended up meeting up with each other and they started arguing – or he started arguing with Curtis and it led up to a big argument." She said that the defendant tried to walk away, but the victim "hit him in his face" and then "hit me in my stomach as I was already pregnant." Ms. Anderson recalled that her pregnancy was classified as "high-risk" because she also suffered from epilepsy. Ms. Anderson testified that after striking her, the victim "told us if we was to go home, he was going to come and see about us," which she interpreted as a threat on her life. Ms. Anderson said that two days after the defendant's arrest, "[t]hey came and shot my house up while I was in there by myself."

During cross-examination, Ms. Anderson conceded that after the defendant shot the victim, neither she nor the defendant called 9-1-1 even though they knew that the victim had been mortally wounded. Instead, they got into their car and drove home. Ms. Anderson admitted that when questioned by the police, she lied to the police, denied that the defendant had any involvement in the shooting, and provided him with an alibi. Ms. Anderson conceded that the defendant had possessed the firearm that he used to shoot the victim for quite some time before the shooting even though he was a convicted felon and even though they had small children at home.

Ms. Anderson testified that the defendant was not armed during their first encounter with the victim at Montgomery Village that ended in the victim's striking the defendant. After the altercation, she and the defendant drove home so that the defendant could get his gun. They returned to Montgomery Village and parked in a different location because the defendant did not want the victim to see him. The defendant then got out on foot and went looking for the victim. She insisted that the defendant "was protecting his family."

The defendant testified that he had a "rough" childhood and that, when he lived with his mother, she would hit him "[n]ot often, but sometimes." He said that the years he spent living with his father were "more rough" because his father treated him badly, burning him with a cigarette on one occasion. The defendant earned a special education diploma and had been diagnosed with Attention Deficit and Hyperactivity Disorder and Post-Traumatic Stress Disorder. At the time of the offense, he worked "with this guy named Cody" performing "[c]onstruction clean-up." The defendant acknowledged that he had used marijuana on a daily basis since he was 17 years old.

The defendant testified that he had known the victim "from being around the neighborhood" and that the victim had been to his house three or four times. Before the day of the offense, he and the victim had not had any issues. On that day "we got into an argument that le[]d us to get into a fight and he . . . assaulted me and he assaulted Kiara too." The defendant said that the victim "kept saying that he was on his way back to prison and he didn't . . . care about our lives and that he was going to kill me, my baby, and my old lady." In response to the court's question about the genesis of the argument, the defendant said, "I couldn't tell you. I know that he was just – I know that he was out of control."

Following the first encounter with the victim, the defendant and Ms. Anderson returned to their home "[t]o get away from the situation." The defendant testified that he armed himself with a handgun "[j]ust so I could protect myself and Kiara." After the defendant armed himself, he and Ms. Anderson went to the defendant's brother's apartment in Montgomery Village. He said that his "brother didn't come to the door, and [the victim] came behind the building and he was like, come here and let me talk to you for a second." The defendant claimed that the two men "got to talking" and the victim "got mad again." The defendant insisted that he agreed to speak to the victim because "I thought that I could de-escalate the situation" so that "it wouldn't go further than it had already went." The defendant claimed that the victim "walked up on me and he started punching me again." He said that he felt "[a] little intimidated." The defendant drew his gun, pointed it at the victim, and the victim "swung and then it went off and hit him."

The defendant testified that he "felt bad" about having shot the victim but nevertheless fled the scene without calling for help. The defendant admitted that he lied to the police when he first talked to them. The defendant said that he felt "a little sorry" that the victim had died and that he "wish I wouldn't have picked up a gun."

The defendant introduced into evidence a certified copy of the victim's conviction of carjacking as well as a warrant charging the victim with driving under the influence, which warrant would have resulted in a violation of the victim's probation. He

-3-

argued that this evidence corroborated his version of events because it indicated that the victim was, in fact, heading back to prison.

The victim's mother, Ingrid Dale, testified that she "was told from the people in the community, and I can only go by what they said, and what they said and what they testified to are totally different from what I heard." She said that she could not see the victim "hitting that lady in the stomach being pregnant." Ms. Dale said that it was her understanding that Ms. Anderson "[s]lipped the gun to him. He pulled the gun and [the victim] ran for his life. He ran down a hill. He ran out of his shoes. And my son bled to death and he died." She asked the court to "take into consideration the truth. That he left a situation and had a plan to come back instead of taking his girlfriend, fiancée, to the emergency room." Instead, she said, the defendant "was mad. I assume he got beat up and he was embarrassed. And I guess he wanted to stand on his gun to be ten feet plus. And he shot and killed my son."

The court found that the defendant had a history of criminal convictions or criminal behavior in excess of that necessary to establish the appropriate range, that the defendant had a history of unwillingness to comply with sentences involving release into the community, that the defendant used a firearm during the commission of the offense, and that the defendant had a juvenile adjudication that would have been a felony conviction for an adult. *See* T.C.A. § 40-35-114(1), (8), (9), (16). The court observed that Ms. Dale's version of the offense made sense, addressing the defendant, "I think you got embarrassed. I think you got beat up in front of your fiancée and you went back to make sure that you were going to not be disrespected further." The court added the defendant "brought a gun to a fist fight," which changed the equation and resulted in the victim's death. The court imposed a sentence of 22 years' incarceration.

In this appeal, the defendant asserts that the sentence imposed by the trial court is excessive because the trial court erroneously based its sentencing decision on the unproven theory of the case advanced by Ms. Dale.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant ... in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-

99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

Here, the defendant does not quibble with the trial court's application of the enhancement and mitigating factors but, instead, argues that the court based the sentence on an erroneous version of events. In our view, however, the record belies the defendant's assertion. Although the trial court indicated that it believed Ms. Dale's version of events to be closest to the truth, it based its sentencing decision on the application of the enhancement and mitigating factors. The court was particularly concerned about the defendant's decision to retrieve a firearm and return to the scene of the earlier altercation despite that he was prohibited from owning a firearm by his prior felony conviction and despite that the earlier quarrel had ended. In any event, because the trial court considered all relevant principles associated with sentencing, no error attends the imposition of the within-range sentence.

_____
JAMES CURWOOD WITT, JR., JUDGE